**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal Action No.:  15-0081 (RC) |
| : | |
| GREGORY JONES, : | Re Documents No.:   6, 7 |
| : | |
| Defendant. : | |

<u>**MEMORANDUM OPINION**</u>

DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND DENYING
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

**I.  INTRODUCTION**

Defendant Gregory Jones was indicted on one count of possession with intent to distribute a substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and one count of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).  Before the Court is Jones's motion to suppress physical evidence that was recovered after Jones was stopped by police (ECF No. 7) and his motion to suppress statements he made during two later interviews conducted with members of the District of Columbia Metropolitan Police Department ("MPD") (ECF No. 6). Upon consideration of the motions and the government's oppositions thereto, the Court will deny both motions.

**II.  FACTUAL BACKGROUND**

In the early morning hours of June 29, 2015, Officer John Wright and Officer Patrick Vaillancourt of the MPD's Narcotics and Special Investigations Division Gun Recovery Unit were patrolling the Trinidad neighborhood of Washington, D.C.  Tr. of Mot. Hr'g at 8–9, ECF

No. 14. The unit had been dispatched to patrol that neighborhood in light of several recent homicides involving firearms. *Id.* at 9. The officers drove an unmarked gray Ford Explorer and were dressed in casual attire, although they wore tactical vests with police placards on the front and back. *Id.* at 9, 41.

While driving on the 1100 block of Queen Street, Northeast, the officers observed four men sitting on the stairs and landing of an apartment building at 1116 Queen Street. *Id.* at 9–10. Defendant Jones and another individual were both sitting on the landing in front of the door, while two other men sat on the front steps of the building in front of Jones. *Id.* at 12. Officer Vaillancourt testified that the men's presence drew the officers' attention because there were no other people out in that area after midnight. *Id.* at 14, 36. In front of the men and on the bottom step of the stoop were four liquor bottles. *Id.* at 14. The officers stopped their vehicle in front of the building. From the vehicle, Officer Wright identified himself and Officer Vaillancourt as police officers and began a conversation with the men. *Id.* at 14. During that conversation, Officer Wright asked if the men had any firearms on their persons. According to Officer Vaillancourt's testimony, the men, including Jones, appeared nervous and reluctantly responded in the negative. *Id.* at 14–15, 38.

Officer Wright then asked if he could see the men's waistbands. *Id.* at 14–15. Three of the men complied and lifted their shirts to expose their waistbands. As a result, the officers could visibly see that those men were not carrying firearms in their waistbands. *Id.* at 15. Jones, however, was sitting behind one of the other men. Officer Vaillancourt testified that Jones did not stand up completely and, as a result, the majority of Jones's body—including his waistband—remained obstructed from the officers' view. Jones did raise his arms halfway over his head, and up to his shoulder area. But, unlike the other men, he did not lift up his shirt and

2

display his waistband. *Id.* at 15–16, 43–45. When Jones raised his arms, the officers also noticed that he was wearing a single, white latex glove on his right hand. From his training and experience, Officer Vaillancourt understood latex gloves to be commonly worn by individuals who distribute PCP while handling the drug. *Id.* at 16.

At that point, and "[b]ased on the suspicion that there may be liquid PCP or even firearms, based on Mr. Jones'[s] awkward response to [the officers'] question," Officer Wright called for backup, although he and Officer Vaillancourt remained in the vehicle. *Id.* at 16. While the officers waited for backup to arrive, the men began to gather their things. Officer Vaillancourt noticed Jones "moving something around his waistband to his left side." *Id.* at 17. Then, as if "there was something he was trying to move underneath his butt," Officer Vaillancourt observed Jones "sort of rock[ing] back and forth as if to adjust his seat" and doing so "continuously." *Id.* at 17. When the man sitting in front of Jones stood, Officer Vaillancourt was able to see Jones more clearly, and he saw that Jones's "hands were pretty much in between his knees while he was sitting, and it appeared he was trying to stealthily just take the glove off." *Id.* at 18. Officer Vaillancourt "decided to exit the vehicle and try to continue [the officers'] contact with [the men] and try to keep them in the area while the other officers were still responding." *Id.* at 18. Although the officers remained on the sidewalk and attempted to continue talking with the three men other than Jones, the officers "didn't observe anything suspicious from th[ose] individuals" and "allowed them to walk out of the area." *Id.* at 18; *see also id.* at 56.

Jones also attempted to leave. As Jones stood, however, the officers noticed a black, opaque plastic bag on the landing where Jones had been sitting. *Id.* at 20. Because "Jones was doing other things besides gathering his stuff together," Officer Vaillancourt testified that Jones

3

"seemed to be a little bit behind everyone." *Id.* at 19. As Jones attempted to follow the other men, Vaillancourt told Jones: "I need to talk to you for a second, you need to stop." *Id.* Instead of stopping, Jones quickened his pace. *Id.* Although the officers attempted to stop him, Jones tried to push through them. *Id.* A scuffle ensued during which the officers took Jones to the ground. *Id.* With the help of the additional officers who by then had arrived as backup, Officers Wright and Vaillancourt handcuffed Jones. *Id.* at 20.

After Jones was restrained, Officer Wright looked underneath the plastic bag on which Jones had been sitting. *Id.* Underneath the bag, the officers recovered a semi-automatic Glock firearm loaded with one round of ammunition, and an extended magazine that contained twenty-nine rounds.[1] *Id.* at 22–23. The officers also recovered two smaller plastic bags from underneath the larger, black bag—one was clear, and the other was white and opaque. *Id.* at 20, 23. The clear bag contained twenty blue zips, while the solid white bag contained thirty-five blue and pink zips. *Id.* at 25. Together, fifty-five zips were recovered, and the results of a sample field test indicated the presence of cocaine base. *Id.* Finally, a white latex glove was also left on the stairs. *Id.* at 26. After recovering the firearm and drugs, the officers decided to arrest Jones.[2] *Id.* at 54.

---

[1] In response to the prosecutor's question asking what Officer Wright found "in the [black plastic] bag" Officer Vaillancourt initially stated that Wright "located a black semiautomatic firearm." Tr. of Mot. Hr'g at 20. Although that answer might imply that the firearm was located inside of the bag, later in his testimony Officer Vaillancourt clarified that the firearm was located under the bag, *id.* at 22, and that he neither looked at nor knew what was inside of the black bag, *id.* at 50.

[2] After discovering the firearm and drugs, the officers also conducted a more thorough search of the area for contraband. The officers were unable to locate the source of the smell, but a second firearm was recovered in the stairwell of the building, for which Jones was not charged. Tr. of Mot. Hr'g at 29. In addition, after Jones's arrest, and without providing *Miranda* warnings, Officer Wright asked Jones whether he had a license or permit to carry a firearm in the District of Columbia and whether Jones had a prior felony conviction. *Id.* at 26–27; 53. Jones responded to those questions and also made subsequent statements while waiting for a transport

Jones was transferred to the MPD's Fifth District station, where he was interviewed by Detective Hain. *Id.* at 32. After introducing himself and obtaining background information about Jones, including his name, date of birth, and address, Detective Hain informed Jones that he was arrested for possession with intent to distribute drugs while armed and stated that "if you want to talk to me about that, I've got to read you your rights." Gov'ts Ex. 10 (DVD of Def.'s Interview at Fifth District) at 5:14–8:02. Detective Hain then asked Jones if he was under the influence of any drugs, narcotics, alcohol, or prescription drugs. *Id.* at 8:03–8:05. Jones told Detective Hain that he was under the influence of alcohol and that he "just had one" drink. *Id.* at 8:06–8:14. In response to the detective's question as to whether Jones understood what was going on around him, Jones answered "No." *Id.* at 8:15–8:24. Jones then asked, without prompting: "Can I have a lawyer?" *Id.* at 8:25. At that point, Detective Hain said "all right," ceased talking to the defendant, and began writing on the piece of paper in front of him. *Id.* at 8:26–8:31.

Roughly five seconds later, and unsolicited, Jones then initiated the following conversation:

> JONES: What do you want to ask me questions about, first?
>
> DETECTIVE HAIN: Nah, man, you're --
>
> JONES: No, but I don't need a lawyer. [inaudible]

---

vehicle. *Id.* at 29–30. Jones has supplemented his motion to suppress statements to include those post-arrest statements. *See* Def.'s Supplement to Mot. to Suppress Statements, ECF No. 10. The government has since represented that it will not seek to introduce any of those statements. *See* Gov'ts Response to Def.'s Supplemental Mot. to Suppress Statements, ECF No. 12. In light of the government's representation, the Court will deny as moot the motion to suppress with respect to those statements.

5

>DETECTIVE HAIN: You said you weren't coherent, you didn't understand what was going on, so I don't want to force you --
>
>JONES: But I don't understand. But I don't understand like why they are charging me with distribution while armed. That's crazy. [inaudible] lawyer. I don't need a lawyer. Read me my rights and let's get this shit out of the way. I ain't got time to keep playing.
>
>DETECTIVE HAIN: Well, I mean, first of all you already told me, you already told me you were under the influence of alcohol.
>
>JONES: [inaudible] Yeah I told you the truth.
>
>DETECTIVE HAIN: So do you understand what's going on around you? Do you feel coherent? --
>
>JONES: I understand. I understand.
>
>DETECTIVE HAIN: Are you willing to converse with me?
>
>JONES: Yes. I understand you brought me upstairs, I understand you came and got me from downstairs, I understand why I am here, I understand all that . . . .

*Id.* at 8:31–9:34. Detective Hain then read Jones his rights, and Jones proceeded to orally waive them. *Id.* at 9:33–10:26. During their conversation, Jones stated that he initially saw the firearm on the landing when he came outside of the apartment building, and that he had moved it aside after he sat down. He claimed, however, that the firearm was not his. Following his interview with Detective Hain, Jones was transferred to MPD's Homicide Branch where he was

6

interviewed a second time and provided a similar description of the events.[3] *See generally* Gov't's Ex. 9 (DVD of Def.'s Interview at Homicide Branch).

Jones was indicted the next day on one count of possession with intent to distribute a substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and one count of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Jones has now moved to suppress the physical evidence recovered from the landing of the Queen Street address—specifically, the firearm and the fifty-five zips that field tested positive for cocaine base—and the statements he made to detectives at the Fifth District and at the Homicide Branch.

### III. ANALYSIS

Because resolving Jones's motions requires an analysis of two distinct bodies of law, the Court will consider each motion in turn.

#### A. Defendant's Motion to Suppress Physical Evidence

#### 1. Legal Standard

Jones claims that the physical evidence recovered from Queen Street was seized "as a result of the unconstitutional seizure of Mr. Jones." Def.'s Mot. to Suppress Physical Evidence at 1, ECF No. 7. "When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Typically, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or

---

[3] The name of the homicide detective who interviewed Jones is not apparent from the record.

seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). When "'a defendant produces evidence that he was arrested or subjected to a search without a warrant,'" however, "'the burden shifts to the government to justify the warrantless arrest or search.'" *United States v. Jones*, 374 F. Supp. 2d 143, 147 (D.D.C. 2005) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951) ("[T]he burden is on those seeking the exemption to show the need for it."). Because the police in this case did not act pursuant to a warrant, the government bears the burden of showing that its interaction with Jones passes constitutional muster.[4]

The Fourth Amendment guarantees that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. As a result of this guarantee, "all

---

[4] Although the police acted without a warrant, the government contends that at least a portion of Jones's encounter with police before his arrest was a consensual encounter that did not constitute a seizure within the meaning of the Fourth Amendment at all. *See* Gov't Mem. Opp. at 7–8, ECF No. 9. It is not clear whether a defendant bears an initial burden to show that a search or seizure took place in such circumstances. *See* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.2(b), at 58 (5th ed. 2012) ("The Supreme Court is divided on the question of whether the was-there-a-search burden should always fall on the defendant."). Some circuits have held that the government bears the initial burden of showing that a voluntary, consensual encounter took place, while other circuits appear to require a defendant to first show that he was subjected to an unlawful seizure. *Compare, e.g.*, *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (noting that, in a "consensual encounter" which "does not implicate the Fourth Amendment," the "government bears the burden of proving voluntary consent based on a totality of circumstances"), *with United States v. Thomann*, 609 F.2d 560, 563 (1st Cir. 1979) ("In order to base a challenge to illegally seized evidence on the fourth amendment, a petitioner must show that he or she has a protectable interest in the items seized or property searched, *or that he or she was the subject of an unlawful search or seizure*." (emphasis added)). The D.C. Circuit's recent cases do not identify which party bears the burden of showing that an interaction was consensual (or was not). Nevertheless, for two reasons the Court here will assume without deciding the correctness of those courts that place the initial burden on the government. First, the government has not disputed Defendant's assertion that the government bears the burden of proof in this case. Second, and as explained below, the assignment of the burden will make no difference to the outcome of this case because the government is nevertheless able to carry that burden here.

seizures, even ones involving only a brief detention short of traditional arrest," must be "founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015), *cert. denied* --- S. Ct. ----, 2015 WL 4611345 (U.S. Oct. 5, 2015) (internal quotation marks and citations omitted).

Yet, not every interaction between law enforcement and private persons amounts to a seizure within the meaning of the Fourth Amendment. Only when "an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen,'" does a seizure occur. *Id.* at 786–87 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). To assess whether an officer has restrained a citizen's liberty, a court must ask whether, "in view of all the circumstances surrounding the incident, a reasonable person" in the defendant's shoes "would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)); *see also Gomez v. Turner*, 672 F.2d 134, 140 (D.C. Cir. 1982) (noting that "the test must not be what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes" (internal quotation marks and citation omitted)). The Supreme Court has made clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). Ultimately, an "encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Bostick*, 501 U.S. at 434.

9

When an encounter does lose its consensual nature, probable cause may not be required in order to detain an individual. In *Terry v. Ohio*, the Supreme Court "for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry* "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion exists when a law enforcement officer has "specific and articulable facts," which, considered together with rational inferences from those facts, indicate that criminal activity may have occurred or may be occurring. *Terry*, 392 U.S. at 21, 30. When making a reasonable suspicion determination, courts are instructed to view the "totality of the circumstances" and not to engage in a "divide-and-conquer analysis" that asks whether each fact is "susceptible to an innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Thus, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* at 277. Although an officer's reliance on a mere "inchoate and unparticularized suspicion or 'hunch'" is insufficient to establish reasonable suspicion, *see Terry*, 392 U.S. at 27, the likelihood of criminal activity need not rise to the level required for probable cause, nor even to the preponderance of the evidence standard, *see United States v. Sokolow*, 490 U.S. 1, 7 (1989).

### 2. Analysis

Jones contends that the government is unable "to demonstrate that MPD officers possessed the requisite probable cause or reasonable suspicion to stop Jones prior to the point in time that he allegedly relinquished the firearm and drugs." Def.'s Mot. to Suppress Physical

10

Evidence at 2. The government responds that the officers' initial interaction with Jones was a consensual interaction and that the officers possessed reasonable suspicion once they did stop Jones. *See* Gov't Mem. Opp. at 7–9, ECF No. 9.

The Court agrees with the government that the officers' initial interactions with Jones did not constitute a seizure, and finds a recent D.C. Circuit case, *United States v. Gross*, particularly informative. In *Gross*, the D.C. Circuit concluded that no seizure had occurred where four officers drove up beside Gross as he walked on the sidewalk and one of those officers, "speaking to [Gross] from the police car, asked if he was carrying a gun and [if he] would expose his waistband." 784 F.3d at 787. The Circuit found it informative that "all four officers remained in a car separated from Gross by one lane of traffic during [the officer's] questioning" and that, "while the officers carried weapons, there [was] no indication that the weapons were visible to Gross from the sidewalk." *Id.* The Court also noted that, while "direct *accusations* of criminal conduct by officers have weighed in favor of finding a seizure," "[q]uestions alone . . . ordinarily do not amount to a 'show of authority' sufficient to constitute a seizure." *Id.* at 788 (emphasis in original). And the court concluded that the nature of the officer's questioning there—simply asking whether Gross carried a gun and whether the officer could see his waistband—"did not accuse Gross of possessing a gun or committing a crime." *Id.*

So too here. In fact, the interaction between the police and the defendant in *Gross* bears a striking similarity to the officers' interaction with Jones and his three companions in this case. For one thing, the officers here remained in their vehicle and spoke to Jones and his companions from the street and while inside the vehicle. *See id.* at 787. The mere presence of a police car, "[b]y itself . . . is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave." *United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007). As in *Gross*,

11

the officers asked Jones and his companions if they were carrying a gun and if they would lift their waistbands. Like the questions in *Gross*, nothing in the record indicates that a reasonable person would have felt that he was required to answer the officers' questions. There is also no evidence here—particularly in light of the fact that the officers remained in the vehicle—that, when asking those questions, the officers spoke aggressively toward the men, displayed their weapons, or accused the men of possessing a firearm or committing a crime. *See id.* at 787–88. Nor did the officers command that the men stay put or otherwise pose any "physical impediment" to the men's "freedom to walk away" during the initial interaction.[5] *Id.* at 788.

Despite the defense's characterization, nothing in the record indicates that the officers' tactics here were distinctively aggressive or rose to the level of "official intimidation or harassment" which would coerce citizens to "comply with a request that they would prefer to refuse." *Bostick*, 501 U.S. at 438. To be sure, "'most citizens will respond to a police request'" like the one made to Jones and his companions here; but "'the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.'" *Drayton*, 536 U.S. at 205 (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). A reasonable person in Jones's situation would have understood the encounter to be consensual.[6]

---

[5] During the motions hearing, defense counsel emphasized that Jones and his companions were sitting in an enclosed, fenced area in front of the apartment building. Tr. of Mot. Hr'g at 61. Yet, the officers never entered that fenced area—even after they had exited their vehicle—or in any way obstructed the men's ability to leave. For that reason, the Court considers this situation no different from those cases in which the Supreme Court has concluded that the "'presence of agents by the exits [of a location] pose[s] no reasonable threat of detention.'" *Drayton*, 536 U.S. at 205 (quoting *INS v. Delgado*, 466 U.S. 210, 219 (1984)) (noting that the officer "did nothing to intimidate passengers, and he said nothing to suggest that people could not exit and indeed he left the aisle clear").

[6] Defense counsel also asked Officer Vaillancourt several times on cross examination whether the officers' true purpose in approaching the men was to engage them in conversation to see if any of them had firearms. Tr. of Mot. Hr'g at 35–38. This line of inquiry, however, is largely irrelevant. "[N]either the subjective impressions of the defendant nor the subjective

All of this is to say that a stop did not occur until the officers exited their vehicle and attempted to keep Jones from departing. And by *that* point the record indicates that the officers had "a particularized and objective basis for suspecting [Jones] of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

For one thing, Officer Vaillancourt understood the Trinidad neighborhood to be a high crime area. Tr. of Mot. Hr'g at 39; *see Wardlow*, 528 U.S. at 124 ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."). Because Officer Vaillancourt's interaction with the men took place after midnight, the "importance" of the neighborhood's reputation as a high crime area was only "further compounded by the lateness of the hour." *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (citing *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)). Moreover, like the other men, Jones had appeared nervous during his initial response to the police, and, unlike the other men, his movements in response to the officers' request to show his waistband appeared evasive.[7] *Wardlow*, 528 U.S. at 124 (noting that "[n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion").

And although defense counsel contends that Jones's nervousness, alone, does not suffice to establish reasonable suspicion, the officers had perceived several additional facts that contributed to their reasonable suspicion. Indeed, Officer Vaillancourt's testimony that Jones's

---

intentions of the officer determine whether a seizure has occurred." *Goddard*, 491 F.3d at 460; *see also Gomez v. Turner*, 672 F.2d 134, 143 (D.C. Cir. 1982) ("[T]he intent of the officer or the reason behind his decision to approach a pedestrian cannot be the basis upon which we determine whether a seizure has occurred.").

[7] To the extent that Jones's movements might be construed only as a refusal to cooperate, the Court acknowledges the Supreme Court's admonition that "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437. Yet, as this Court's analysis makes clear, there is much more here—and certainly enough to give rise to a reasonable suspicion.

13

nervousness, alone, was not the reason he was stopped is corroborated by the fact that the other three men were not prevented from departing, despite their own nervousness. After Jones failed to show his waistband, the officers observed a series of movements during which Jones appeared to adjust something around his waistband and move it behind and underneath his seat—accompanied by a consistent back-and-forth rocking motion further supporting that inference. *See Brown*, 334 F.3d at 1167 ("It is well settled that an individual's furtive movements may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and search."). The officers had also seen Jones wearing a single latex glove, which, in Officer Vaillancourt's experience, was consistent with the distribution of PCP, and observed Jones's efforts to remove that glove. *See Arvizu*, 534 U.S. at 273 (noting that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (quoting *Cortez*, 449 U.S. at 418)).

While some of these facts may have an innocent explanation, the Court must avoid engaging in a "divide-and-conquer analysis" or considering whether each fact, in isolation, is "susceptible to an innocent explanation." *Id.* at 274. Collectively, the high crime area, the late hour, Jones's evasive, nervous behavior, the furtive movements that suggested an effort to conceal contraband, and the latex glove he wore and then discarded provided the officers with an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. That suspicion allowed the officers to constitutionally stop and detain Jones as he attempted to leave the scene. The Court therefore will deny Jones's motion to suppress the physical evidence recovered as a result of that stop.[8]

---

[8] With respect to the physical evidence, Jones has limited his suppression argument solely to contesting the constitutionality of his seizure. *See* Def.'s Mot. to Suppress Physical Evidence at 1 (arguing that the evidence was seized "as a result of the unconstitutional seizure of Mr.

14

## B. Defendant's Motion to Suppress Statements

### 1. Legal Standard

Defendant has also moved to suppress the statements he made to Detective Hain at the Fifth District, and to the detective at the Homicide Branch. He argues that the government is "unable to demonstrate that Mr. Jones was adequately apprised of his rights," and that any waiver of those rights was not "knowing and voluntary."[9] Def.'s Mot. to Suppress Statements at 3, ECF No. 6.

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Nevertheless, it is long settled that "after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *see also North Carolina v. Butler*, 441 U.S. 369, 372–76 (1979). Any waiver must be "knowing and voluntary," *Butler*, 441 U.S. at 373, and when the defendant files a motion to suppress a

---

Jones"); *id.* at 2 (asserting that "the government will be unable to adduce sufficient sworn testimony at a hearing to demonstrate that MPD officers possessed the requisite probable cause or reasonable suspicion to stop Mr. Jones prior to the point in time that he allegedly relinquished the firearm and drugs"). He has not argued that, even if a stop was warranted, the officers' inspection of the items left on the landing exceeded the scope of that investigatory stop. Nevertheless, the Court notes that "permissible investigative measures in the context of a *Terry* stop" include "the examination of objects abandoned by the suspect." *United States v. Askew*, 529 F.3d 1119, 1136 (D.C. Cir. 2008) (citing *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981)).

[9] Jones does not claim that the officers' failure to provide *Miranda* warnings shortly after his arrest and before questioning him on the scene tainted his subsequent statements at the Fifth District and Homicide Branch. Those later statements were made following *Miranda* warnings. *Cf. Oregon v. Elstad*, 470 U.S. 298, 314 (1985) (noting that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement").

15

statement that was allegedly made in contravention of her *Miranda* rights, the government bears the burden of proving by a preponderance of the evidence that the defendant's waiver was made voluntarily, knowingly, and intelligently. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see also United States v. Zaitar*, 858 F. Supp. 2d 103, 115 (D.D.C. 2012).

To assess the voluntariness of a defendant's waiver of her *Miranda* rights, a court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Specifically, the court should evaluate, among other factors, "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *United States v. Murdock*, 667 F.3d 1302, 1305–06 (D.C. Cir. 2012). Although "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver," it is not dispositive. *Butler*, 441 U.S. at 373. The court's inquiry is "not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* The ultimate question is "whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *Murdock*, 667 F.3d at 1305 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

### 2. Analysis

As an initial matter, an accused like Jones, "having expressed his desire to deal with the police only through counsel," may not be "subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." *Edwards*, 451 U.S. at 484–85 (emphasis added); *see also United States v. Straker*, 800 F.3d 570, 622–23 (D.C. 2015). Here,

16

z

Detective Hain ceased questioning Jones immediately upon his request to have counsel present. It was Jones who asked: "What do you want to ask me questions about, first?" After Detective Hain reiterated that Jones had said he wanted a lawyer and had claimed that he was not coherent from the single drink he had, Jones continued to assert that he did not want a lawyer and was willing to talk. "[V]iewed from the perspective of a reasonable officer," as the Court must, "both the content and the context" of Jones's statements "'evidenced a willingness and a desire' to reinitiate communications" with the police concerning his arrest. *Straker*, 800 F.3d at 623 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983)). There is no indication that Detective Hain badgered Jones into discussing the incident. *See Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) ("The *Edwards* rule is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (internal quotation marks and citation omitted)). If anything, the video depicts Hain as reluctant to discuss the matter further with Jones until Jones had repeated—several times—that he was willing to talk.[10]

---

[10] The government acknowledges that the same cannot be said for the statements Jones later made to the homicide detective. After the homicide detective summarized the rights that Detective Hain had read to him at the Fifth District and Jones confirmed that he remembered discussing those rights with Detective Hain and had understood them, Jones stated "I need a lawyer now." Gov't Ex. 9 at 12:38. In what even the government characterizes as an effort to "persuade Defendant Jones to talk," Gov't Mem. Opp. at 11, the homicide detective responded by saying, among other things: "Well, I'll tell you this, you know, I -- there's going to be a situation where you can help yourself"; and "There's going to be a chance for you to help yourself, ok. That opportunity may come later today, it may come in a couple of weeks. Ok? You need to do what's right for yourself, ok? You have a four-year-old kid who needs a father, right?" Gov't Ex. 9 at 12:50–13:22. The government has represented that if this case proceeds to trial and Jones testifies, it may seek to use Jones's statements at the Homicide Branch to impeach Jones's testimony. *See Murdock*, 667 F.3d at 1305 (noting that "statements made by a defendant in circumstances violating the strictures of *Miranda* 'are admissible for impeachment if their trustworthiness . . . satisfies legal standards'" (quoting *Mincey v. Arizona*, 437 U.S. 385, 397–98 (1978)). The Court takes the issue under advisement at this time and will rule on it if this matter proceeds to trial and if Jones testifies.

17

The Court therefore must ask whether Jones's subsequent waiver was voluntary, knowing, and intelligent "under the totality of the circumstances," *Straker*, 800 F.3d at 624–25, and concludes that Jones's waiver here was. Jones is twenty-four years old. Because of his prior felony conviction, he is not a stranger to the criminal justice system. There is no indication that he suffers from a mental or physical condition that would impair his ability to knowingly, voluntarily, and intelligently waive his rights. *See generally* Pretrial Services Report (filed June 29, 2015). And, as the video of his interview with Detective Hain reveals, the interview was not prolonged. At no point did Detective Hain threaten or otherwise pressure Jones in a way that might make his statements involuntary. *See United States v. Robinson*, 698 F.2d 448, 455 (D.C. Cir. 1983) (finding waiver voluntary where "appellant was 30 years old, possessed an eleventh-grade education, and had been convicted twice before of serious felonies," possessed "the maturity, education, and experience with the police to understand the waiver of his *Miranda* rights," and the interview contained "no threats or any use of force that might render his statement involuntary").

The defense does not dispute any of these contentions. Its only effort to cast doubt on the voluntariness of Jones's waiver is its emphasis on the fact that Jones never signed a written warning as to his rights. Tr. of Mot. Hr'g at 59–60. A written warning sheet was filled out and signed by Detective Hain, but that sheet states on the "Signature of defendant" line that Jones's hands were down his shirt. *See* Def.'s Ex. 1. Yet, the fact that a defendant has not signed a waiver of rights is not dispositive; indeed, it is largely irrelevant. As the D.C. Circuit has explained, even an outright "'refusal to sign a waiver [does not mean] that the person interrogated is assuming a contradictory position with respect to his willingness to respond to oral questions, whatever may be his motive in doing so.'" *United States v. Foskey*, 636 F.2d

18

517, 522 (D.C. Cir. 1980) (alteration in original) (quoting *United States v. Cooper*, 499 F.2d 1060, 1062 (D.C. Cir. 1974)); *see also United States v. McNeil*, 433 F.2d 1109, 1113 (D.C. Cir. 1969) ("Certainly the execution of that form was not a condition precedent to an effective waiver."); *United States v. Moghadam*, 733 F. Supp. 134, 136 n.4 (D.D.C. 1990) (noting that "the law does not require a signing of a waiver form, but that the *Miranda* rights be read and that the defendant understands his rights").

Because the Court finds that Jones's waiver was knowing, intelligent, and voluntary, the motion to suppress the statements made to police following that waiver will be denied.

### IV.  CONCLUSION

For the foregoing reasons, Defendant's motion to suppress physical evidence (ECF No. 7) is **DENIED** and Defendant's motion to suppress statements (ECF No. 6) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  November 4, 2015                                                                                  RUDOLPH CONTRERAS
                                                                                                                       United States District Judge